Case number 19-1124, Charles Rudolph v. Sheryl Lloyd et al. Oral argument not to exceed 15 minutes per side. Mr. Cavalier for the appellant. Good morning, Your Honors. I'm Thomas F. Cavalier. Assistant General Counsel at Wayne State University appearing on behalf of the defendants. This is an employment case involving a claim by the plaintiff, employee of the university, that his employment was terminated in violation of due process because he was not given a hearing prior to termination. The property interest that he asserts as a foundation of the due process right is a Veterans Preference Act, a Michigan statute, which gives certain hearing rights to a veteran who is employed by a public body and also dictates the specific grounds for a removal or other kinds of personnel actions. The district court held that – Clarification point first. As far as I read your brief, you're only asserting state constitutional challenges to the Veteran Preferences Act. So you would assume or you would concede as a matter of pure statutory interpretation that the Veterans Preferences Act applies to the university? Your Honor, I think there is a question as to whether the Veterans Preference Act actually does apply to the university inasmuch as it is not entirely clear from the statute whether the legislature intended the term state to apply to – Then why didn't you argue just as a matter of statutory interpretation it does apply? The way I read your brief is to say it does apply, but there are essentially three reasons why it was unconstitutional as applied here. The reason I'm focusing on the constitutional argument, Your Honor, is frankly because I think it is a stronger argument. I do believe that there is – So at least it's forfeited in this case, then, I would assume. I'm sorry, Your Honor? Is it forfeited in this case, then, that we have to assume that the statute applies, setting aside the state constitution? Your Honor, I'm not forfeiting the argument. In fact, it is referenced in a footnote in one of my briefs. Did you raise it in the district court? It was raised in the district court, Your Honor. The district court rejected it. The argument there was that there was a case, the Campbell case, which was decided early in the 20th century held that the statute did not apply to a school district because the school district wasn't listed among the various public bodies that were subject to it. The district court rejected that argument. I don't think the argument here for – on the basis of statutory construction is best based on the Campbell decision. I think it's based on a notion that when the legislature considers state and then put the word state into the statute and then said that the governor was to hold the hearing, given that the governor does not have any supervisory authority over the university and really never has had that since at least 1850, the legislature could be understood to have excluded the university from that term. So you raised a different statutory construction argument in the district court, and here you've alluded to one in a footnote rather than sort of meaningfully developed that argument here. Yes, I have alluded – well, Your Honor, I've more than alluded to it in a footnote, and I believe I argued it basically on the same basis that I just articulated. But what I do wish to – I guess what I would say, Your Honor, is that it is an alternative ground for getting to the same result. My argument on the Constitution assumes that the statute applies to the university. The cases that have raised this issue in the courts over the decades, in fact really almost well over a century, basically assume that. And then the analysis is whether or not the nature of the statute essentially makes it fall outside of the legislature's power to regulate the university on that basis. And that's what I think the problem here is, the constitutional problem, the state constitutional problem with the Veterans Preference Act. If I may turn to that issue, Wayne State University as well as Michigan State University and the University of Michigan are all constitutional body corporates. The Constitution establishes a board which is to govern each of the universities, and with Wayne State it's called the Board of Governors. The members of the board are elected by the people, and the powers of the board are conferred not by the legislature – it doesn't say prescribed by law, it says they are prescribed by the Constitution itself. It's given the supervision, the general supervision of the institution, and also the power to control and direct expenditures from the funds. Here I think the power that is involved is the power of general supervision of the university. That phrase, general supervision, and basically the entire collection of powers has been interpreted by the Michigan Supreme Court essentially to give to the board the power to control and manage the institution. And this was articulated as early as the case of Sterling versus the Regents at the University of Michigan, where the court said that the framers, quote, designed to and did provide for it, the universities, management and control by a body of eight men elected by the people at large. So how do you distinguish – I mean, management and control, that's very broad language. General supervision, which is the constitutional language, is very broad, could encompass a wide variety of things. The Michigan Supreme Court has said it does not include collective bargaining. So how do you distinguish – and you seem to concede that under Regents at the University of Michigan you have to collectively bargain with Mr. Rudolph, with his union. How do you distinguish this case from that case? Well, in that case, the Regents case, the question was – I can distinguish on a number of different grounds, and let me start from the beginning. First of all, the issue in the case really was a battle between two constitutional provisions. One gave the legislature the power to essentially legislate in the area of public employment. Pursuant to that constitutional authorization, it enacted the Public Employment Relations Act. And pursuant to that act, the universities – the issue was whether the university had to collectively bargain with a union, which was essentially established by a very – Do you have any – you don't have a claim here that the MVPA is not within the constitutional authority of the legislature to enact generally. No, not generally, but it cannot apply to the university, yes. But we would have the same conflict here, right? So if the legislature has the power to legislate with respect to labor relations, presumably that encompasses the MVPA as well. So any conflict that was there is also here. The Regents case does not go so far as to say that the legislature has the power to enact any law touching on – Oh, surely not. – that the constitutional autonomy of the university limits the legislature's power. In order to determine whether or not it is limited, we must look at how it affects the university. In the Regents case, the only thing that the university had to do – and I shouldn't say only. Obviously it was more serious to them at the time. But what it was required to do was to bargain the terms and conditions of employment with a union. The legislature did not dictate to the university, you must include these terms and conditions in your collective bargaining agreement. It did not say you can only dismiss a student for these five causes. And if you do so, you must have a pre-termination hearing. It did not say that. That's what the VPA says. The difference here is that the Veterans Preference Act drills down to the very core of the university's operations, how it manages its workforce. In the Federated Publications case – Can I just – I'm sorry. I'm thinking of a hypothetical. So the Michigan Elliott Larson Civil Rights Act contains some categories not contained in federal law. So weight, for example, I think is a protected class. So does the Elliott Larson Act apply to – I mean that – in the places where it does not overlap with federal law, does that apply to the university? Yes, it does apply to the university. Well, why? Because that's dictating a particular term. You can't dismiss somebody because of their weight. Well, Your Honor, I would make the distinction this way. First of all, the Elliott Larson Act is a statute of general application. It applies to every employee. It was fairly characterized, I would say, as intended for the general welfare. That is not the case with the Veterans Preference Act. The Valentine case – in your view relates to the protected individuals, not to the employers in general? I mean, because the VPA would seem sort of in an overall way it applies to all employers in Michigan. You're saying, but it doesn't apply – excuse me, it doesn't apply to all employees. It applies to all public – well, excuse me, Your Honor. It applies to the public employers that are listed in the statute. Well, right, but I mean – but so it's not – general applicability, in your view, goes to the employer side and not the employee side. No, it does not apply to all employees. It does not apply to all employees. It only applies to employees who have veteran status. So my question is, so does that make it not a law of general applicability? If it does apply to all public employers, I'm trying to figure out how you are defining a law of general applicability here. The point I'm trying to make, Your Honor, and I may have mischaracterized the point by using the phrase general applicability. The point I'm trying to make is that it is not for the general welfare. This is a statute that the Michigan Supreme Court has acknowledged is more of a reward than anything else. It is – this is the Valentine case I'm referring to. It says that it's an expression of – But why isn't it for the general welfare because we want to incentivize military service because military service protects the country? I'm sorry, sir? Why isn't it for the general welfare because we want to incentivize military service because military service protects the country? Military service does protect the country, Your Honor. I think that's general welfare. But this is not something that is specifically for the purpose of encouraging individuals to be in the military. There's nothing in the case law that suggests that. The particular terms of the statute are very much rooted in the ordinary employment operation of the institution. It does not provide special kinds of support services and so forth for veterans. So it is not really the same type of purpose, I think, that you're getting at. I see my time is up. I would like to reserve five minutes. He did that in advance. Okay, thank you. Good morning, Your Honors. To a large extent, I think I've made my points in my brief. I don't want to just reiterate everything that's in there. But in 1996, W.T. Andrew I made it clear that some of the old case law that the Wayne State defendants are relying upon was no longer good, like the old case law from the 1800s, early 1900s. And it also said the Regents case, which Judge Larson referenced from 1973 regarding public collective bargaining, implicitly overruled Weinberg, which was one of the cases that a lot of these old cases cited and relied upon. So things changed, if not in 1973, implicitly in 1973 and explicitly in 1996 with Andrew I. The cases relied on, or the more modern case, federated publications, also acknowledged general legislation normally applies to universities. It spoke about electing a president. That's a lot different than, you know, that's a core function of the board. Other core functions of the board, you know, what the board does in context much different than the employment of a custodian like Mr. Rudolph. It seems strong with Regents from 1973, the language and federated publications, Peters, which Andrew I adopted or acknowledged approvingly, and Western Michigan Board of Controls, that these general laws impacting laborers apply to. How would you distinguish, I think it's a beading decision, separation of powers, the governor can't intrude on the legislative function. There seems to be an analogy there that could be drawn that the governor's office shouldn't be able to intrude on the decision making of the university too. There's obviously the prime separation of powers issues, judiciary, legislature, and governor. The universities back in the 1800s and early 1900s, they were given more something close to another, being another branch. But those cases I just referenced clearly indicate that the universities are subject to general laws unless it impacts their educational sphere of autonomy. Beadling also specifically stated that the Michigan Veterans Preference Act applies to all agencies of each branch. And it's long been held universities are a branch and department of the executive branch. And it's worth noting that 35402, the Michigan Veterans Preference Act, references public departments. And the case law says universities are public departments. How did it work here because the governor's office wasn't at all involved in the hearing that happened in the district court. I assume it was just the parties consented to a neutral arbitrator that each side was happy with? We consented to a process of alternating strikes from a list picked by the Federal Mediation and Conciliation Service gave us a list. And we agreed for alternating strikes until one person was left. And that's how we came up with them. In a conference, although it's not in the record, the judge asked us, do you guys want the governor involved? And we said no. We'll take a partial decision maker. Both sides agreed. Is that argument even on the table anymore then since the governor's office? We decide concrete constitutional questions, but the question isn't even seemingly implicated in this case. I don't believe it is. Interesting. In relation also to this language about universities being subject to general laws, a number of those cases cited some very strong language from the Branham case versus Board of Regents of U of M. It quoted, regents quoted it, federated publications quoted regents quoting Branham. Western Michigan Board of Control quoted it. And Booth newspapers cited Peters, Regents, and Branham stating it's been repeatedly held by Michigan courts that universities are subject to general laws. Now I will, unless there are more questions, I will rely on the points of my brief other than to say a lot of the issues that were raised were not raised in the lower court. The case, one of the main cases they cite is saying, hey, you can excuse us, Penny Dock was quoted. And another case they cite, United States versus Ellison, says that an exception can be made in exceptional cases or if there's a plain miscarriage of justice. I will rely on my briefs for the proposition that none of those claims they're making that were not raised, all the claims they're making that were not raised below are without merit. But the court doesn't have to utilize its judicial resources to sift through all that. If there are no more questions, I'll sit down. Thank you. Thank you. I just want to address a couple of questions. First, on the notion of general applicability. In the Federal, excuse me, in the Federated Publications case, the statute that was involved was the Open Meetings Act. The Open Meetings Act was a statute of general applicability in the sense it applied to public bodies. But it did not involve, as had virtually every case that we have talked about this morning, the Michigan Supreme Court has addressed, it did not involve the financial power of the university. It involves the supervisory power. So this is what the Supreme Court said in introducing its analysis. He said, in this case, we do not consider a generally applicable law that implicates university financial autonomy. Rather, we consider a law that dictates the manner in which the university operates on a day-to-day basis. So it's not the case that all laws of general applicability apply to the university, because the Supreme Court held in this case that the Open Meetings Act did not. Sure. So why does your case not apply, but PARA does? Right. So PARA applies. You concede that. The Elliott Larson Civil Rights Act applies. You concede that. The Open Meetings Act does not apply. Why is your case more like the Open Meetings Act than the other employment regulations we've just discussed? Well, there are a number of reasons. One is that, as I mentioned before, unlike the Open Meetings Act, the VPA applies to the university's operations on a day-to-day basis. If the Supreme Court can hold that the application of the Open Meetings Act to subcommittees of the board dealing with the presidential selection is a matter of day-to-day operation, certainly handling routine personnel actions at a university that employs 7,500 people must be even more so a day-to-day operation. Would it be the same thing with respect to the Elliott Larson Act with respect to wait? So I don't know anything about Mr. Rudolph, but let's say Mr. Rudolph was overweight and you said, I want to fire him because he's overweight. If he were an at-will employee, you could just fire him for any reason. But the Elliott Larson Act would say, no, you can't fire him for that reason. So why is that different than saying you can fire a veteran, but only for certain reasons? What's the difference? Because, Your Honor, the statute goes beyond simply specifying the causes or excluding the causes that is in the Elliott Larson Act. It says you have to also have a hearing in order to determine whether or not it's proper to remove the individual. Elliott Larson does require you have to have a pre-termination hearing. The court will review it later on to determine whether or not there was a protected class whose interests were violated. So para, you have to bargain. Yes, you have to bargain, Your Honor, and in this case, we did bargain with them. And what we bargained for was that any member of the bargaining unit, which would include Mr. Rudolph, could be discharged for any just cause and that if the union or the employee disagreed, they had available to them a grievance procedure and arbitration. In this case, Mr. Rudolph did follow the grievance procedure, but the union decided, and presumably Mr. Rudolph also, not to arbitrate. Now, Your Honor, what happens here is that there is a conflict now that is set up. Yes, we have to collectively bargain. The Supreme Court held that in the early 70s. But now we're told it's not enough to collectively bargain. You can bargain all you want with the union that represents the custodians, but if it's a veteran, you must now deviate from what the collective bargaining says. Throw that out the window because now it's not just any just cause. It's these specific causes, and even if you find a specific cause, you must hold a pre-determination hearing. So that seems like maybe what you're arguing is these statutes are irreconcilable. They can't operate together. That seems like a question of statutory interpretation that maybe should have raised in the district court, that the para preempts the MVPA. But those arguments weren't raised until now. It's not a preemption argument, Your Honor. It's an argument that shows that the policy underlying the Veterans Preference Act, which is an issue to be considered in the constitutional argument, and I've cited cases on this, the policy that supports the application of the act, when there is a collective bargaining agreement, that covers the very same area and is in conflict with it. The collective bargaining agreement prevails. Para prevails. I'm not saying it's a preemption. I don't think the court has to go that far. I think the court on that particular point needs to only go so far as to recognize that in the circumstances of this case, there is simply no strong, compelling, clear policy which would mandate the application of the VPA. Where there is a collective bargaining agreement, as in this case, that conflicts with it. I see my time is up. Thank you very much for your attention. Thank you. Thank you both for your helpful arguments today. Case is submitted, and you may adjourn the court.